UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
────────────────────────────────

NICHOLAS J. LeCLAIR,

                          Plaintiff,              1:19-CV-0028
                                                  (BKS/DJS)
            v.

SARAH RAYMOND, et al.,

                          Defendants.

────────────────────────────────

APPEARANCES:                      OF COUNSEL:

NICHOLAS J. LeCLAIR
Plaintiff, pro se
P.O. Box 1426
Oil City, PA 16301

MURPHY BURNS LLP                  STEPHEN M. GROUDINE, ESQ.
Attorneys for Defendants Raymond,
Breen, Lord, Hoerter, and Warren County
407 Albany Shaker Road
Loudonville, NY 12211


BRENDA K. SANNES
United States District Judge


### MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiff Nicholas LeClair ("Plaintiff") commenced this civil rights action on behalf of

himself and his minor children, hereinafter referred to as I.L. and S.L., by filing a pro se civil

rights complaint pursuant to 42 U.S.C. § 1983 ("Section 1983"), together with an application

to proceed in forma pauperis ("IFP").  Dkt. No. 1 ("Compl."); Dkt. No. 2 ("IFP Application").

Thereafter, plaintiff filed an amended complaint as of right wherein he asserted Section 1983

claims against Warren County and Warren County Department of Social Services ("DSS") employees Tammy Breen, Terra Cahill, Danielle Colon, Whitney Hoerter, John Lord, and Sarah Raymond, among others. Dkt. No. 4 ("Am. Compl.").

By Report-Recommendation and Order entered on March 21, 2019, the Honorable Daniel J. Stewart recommended that the following claims be allowed to proceed in this action: (1) Plaintiff's Fourteenth Amendment Substantive Due Process claim against Defendants Raymond, Colon, Lord, Breen, Cahill, Hoerter and Warren County, for alleged interference with his rights to custody of his children based upon the use of false, fraudulent, or coerced evidence during a Warren County Family Court custody proceeding; and (2) Plaintiff's Fourth Amendment claim against Defendant Raymond based on her alleged illegal entry into Plaintiff's apartment in August, 2018. Dkt. No. 7. Magistrate Judge Stewart recommended that the remaining claims asserted in the amended complaint be dismissed, including all claims asserted on behalf of Plaintiff's two infant children. *Id.* By Memorandum-Decision and Order entered on July 1, 2019, this Court adopted the Report-Recommendation and Order. Dkt. No. 12. Thereafter, Plaintiff filed a motion to amend his amended complaint, and Defendants filed a cross-motion to dismiss the due process claims in the amended complaint. Dkt. No. 36 ("First Motion to Amend"); Dkt. No. 47 ("Cross-Motion to Dismiss").[1]

By Memorandum-Decision and Order entered on August 25, 2020, Plaintiff's Fourteenth Amendment claims against Defendants Cahill and Colon were dismissed, and Plaintiff was granted another opportunity to amend and serve a Second Amended Complaint clarifying his Due Process claims against Defendants Raymond, Hoerter, Lord, Breen, and

---

[1] The Cross-Motion to Dismiss also sought, in the alternative, dismissal of the proposed second amended complaint in its entirety. *See* Dkt. No. 47.

Warren County.  Dkt. No. 73.  The Second Amended Complaint was filed on the docket on

August 27, 2020.  *See* Dkt. No. 75 ("SAC").[2]

Presently before the Court are the following: (1) Plaintiff's Motion for Partial Summary

Judgment (Dkt. No. 131);[3] (2) Defendants' Motion for Summary Judgment (Dkt. No. 139); (3)

Plaintiff's motions to seal certain documents (Dkt. Nos. 136, 142, 149); (4) Plaintiff's motion

to unseal certain documents filed under seal by Defendants (Dkt. No. 156); (5) Defendants'

motion to seal and unseal certain documents (Dkt. No. 157); and (6) Plaintiff's appeals of two

orders entered by Magistrate Judge Stewart (Dkt. Nos. 77, 90, 162).[4]

For the reasons that follow, Plaintiff's Motion for Partial Summary Judgment is denied,

Defendants' Motion for Summary Judgment is granted in part and denied in part, Plaintiff's

appeals are denied, and the sealing motions are granted in part and denied in part.

---

[2]  A detailed recitation of the claims set forth in Plaintiff's Second Amended Complaint is contained in this Court's Memorandum-Decision and Order entered on August 25, 2020, and will not be restated herein.

[3]  Although Plaintiff's notice of motion and affidavit in support of his motion for partial summary judgment do not indicate the claims on which Plaintiff seeks summary judgment, Plaintiff's memorandum of law expressly refers to the motion as seeking "partial summary judgment[,]" and addresses only the Fourteenth Amendment claims.  *See* Dkt. No. 131-1 at 10, 25-26.

[4]  Certain of the documents submitted with Defendants' Motion for Summary Judgment were submitted under seal, prior to the entry of a sealing order.  *See* Dkt. Nos. 139-3, 139-4, 139-5, 139-8, 139-9, 139-10, 139-11, 139-12, 139-13, 139-14, 139-15, 139-16, 139-17, 139-18, and 139-19.  On the same day that Defendants filed their Motion for Summary Judgment, they filed a letter request to seal these documents, which included affidavits and the memorandum of law in support of the Motion for Summary Judgment.  *See* Dkt. No. 140.  By Order entered on January 7, 2021, this Court denied Defendants' request without prejudice to them filing a revised motion to seal with a more limited sealing request.  Dkt. No. 146.  Thereafter, Defendants filed a renewed sealing request, and attached to that request redacted versions of certain of the documents that were initially submitted under seal as part of their Motion for Summary Judgment.  *See* Dkt. Nos. 157, 157-2, 157-3, 157-4, 157-5, 157-6, 157-7, 157-8, and 157-9.  Defendants did not, however, re-file the documents that were not sealed as part of their Motion for Summary Judgment, or file slip sheets as placeholders for the documents that they sought to remain entirely under seal.  Thus, the Court has cited Dkt. No. 139 herein only insofar as the cited document was not filed as an attachment to Dkt. No. 157.  Otherwise, for the sake of transparency, the Court has cited the attachments to Dkt. No. 157 when referring to documents filed with Defendants' Motion for Summary Judgment.

## II.    FACTUAL BACKGROUND[5]

On January 12, 2018, Plaintiff and his wife, Emily Whipple, were arrested in New Hampshire on charges of endangering the welfare of a child and cruelty to animals.  Dkt. No. 139-7 at 2, 20.  Plaintiff and his wife were taken into custody, and their children were placed into protective custody.  *Id*. at 9, 27; Dkt. No. 139-4, at 70; Dkt. No. 139-8 at 93-94.[6] ███

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

On January 16, 2018, Plaintiff and his wife were released from custody.  Dkt. No. 139-4, at 71.  The next day, a preliminary hearing on the charges of Juvenile Abuse/Neglect was held in the State of New Hampshire, Judicial Branch, 8th Circuit Court-Family Division-Keene ("8th Circuit Court-Family Division-Keene").  Dkt. No. 139-8, at 132-136.  Following the hearing, Plaintiff and his wife relocated to Warren County, New York, and moved in with Emily Whipple's mother, Lacey Ferguson, and Ms. Ferguson's 19-year old son, Jacob.  Dkt. No. 139-8 at 21-22, 155-162; Dkt. No. 139-4 at 8-9.  Plaintiff's children remained in foster care in New Hampshire.  Dkt. No. 139-4, at 77, 79; *Compare* Dkt. No. 157-7, ¶ 33 *with* Dkt. No. 143, ¶ 33.

On January 29, 2018, Plaintiff and his wife agreed to allow Lacey Ferguson to obtain

---

[5]  In light of the parties' competing motions for summary judgment with respect to Plaintiff's Fourteenth Amendment claims, the court draws "all factual inferences . . . against the party whose motion is under consideration."  *Tindall v. Poultney High Sch. Dist*., 414 F.3d 281, 284 (2d Cir. 2005) (quotation marks omitted).

[6]  As noted, Plaintiff's children are referred to in this Memorandum-Decision and Order as "I.L." and "S.L."

temporary custody of their children. Dkt. No. 139-8, at 165-172, 182. On January 31, 2018, the Honorable Edward J. Burke of the 8th Circuit Court-Family Division-Keene transferred the LeClair/Whipple case to Warren County, New York. *Id.*, at 163.

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████

On February 14, 2018, I.L. and S.L. were released from foster care. *Compare* Dkt. No. 157-7, ¶ 33 *with* Dkt. No. 143, ¶ 33. Plaintiff's children were transported to Lacey Ferguson's home in Warren County, where Plaintiff and his wife also lived. *Compare* Dkt. No. 157-7, ¶¶ 33-34 *with* Dkt. No. 143, ¶¶ 33-34.

On February 16, 2018, Warren County Family Court Judge Ted Wilson ordered that Warren County DSS undertake an investigation into the maltreatment allegations that originated in New Hampshire ███████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ Judge Wilson ordered that a report from DSS be submitted to the Court by February 26, 2018, which was the date of the next scheduled appearance. *Id.* Judge Wilson further ordered Warren County DSS to file any reports prepared with regard to its investigation, as well as any preventive services provided to the family. *Id.*

Following the initial Court appearance, Defendant Raymond was assigned to the investigation ordered by Judge Wilson. Dkt. No. 157-4, ¶¶ 3, 7. In the afternoon of February 16, 2016, Defendant Raymond visited Lacey Ferguson's residence. Dkt. No. 139-8, at 21-23. At the time, Plaintiff, his children, his wife, and Jacob Ferguson resided with Lacey Ferguson. *Compare* Dkt. No. 157-7, ¶ 39 *with* Dkt. No. 143, ¶ 39. Lacey Ferguson grew up in the same area as Defendant Raymond, and the two knew each other. Dkt. No. 139-8, at 21; Dkt. No. 157-6, ¶ 11.

On February 20, 2018, Defendant Raymond spoke with Lacey Ferguson on the telephone, and had a meeting with her supervisor, Caseworker Neel, regarding the case, and on February 21, 2018, she conducted interviews with Plaintiff, his wife, Lacey Ferguson, and Jacob Ferguson. Dkt. No. 139-8, at 21-28. Based on Defendant Raymond's interactions with Lacey Ferguson, Jacob Ferguson, Plaintiff, his wife, and their children, she prepared a seven-day assessment, which was reviewed and approved by her supervisor, Caseworker Neel, on February 23, 2018. Dkt. No. 75-1 at 1-6. The seven-day assessment found that "[i]nterventions are necessary[.]" *Id.*

On February 26, 2018, Judge Wilson granted Lacey Ferguson temporary custody of Plaintiff's children, I.L. and S.L., as set forth in an initial Temporary Order of Custody, which also granted Plaintiff and his wife supervised parenting time on dates and times agreed to by Lacey Ferguson. *Compare* Dkt. No. 157-7, ¶ 36 *with* Dkt. No. 143, ¶ 36; Dkt. No. 139-4, at 267-68; Dkt. No. 139-4, at 267-68. The Temporary Order of Custody indicates that Plaintiff and his wife stipulated to the custody arrangement. Dkt. No. 139-4, at 267-68. According to the order, the court also "searched . . . Family Court's child protective records," and "relied

upon such results in making this order." *Id.*[7]

On February 27, 2018, Senior Caseworker Neel called Warren County Family Court for an update on the custody proceedings. *Compare* Dkt. No. 157-7, ¶ 44 *with* Dkt. No. 143, ¶ 44. Thereafter, Defendant Raymond continued to speak with Lacey Ferguson, Plaintiff, and his wife as part of her investigation, and also consulted other Warren County DSS employees, including two of her supervisors, Defendants Lord and Breen. Dkt. No. 139-8, at 29-56; Dkt. No. 157-3, ¶¶ 1, 11-13; Dkt. No. 157-4, ¶¶ 1, 12-13.

On March 14, 2018, Plaintiff and his wife attended another Family Court proceeding. Dkt. No. 164-1; Dkt. No. 152, ¶ 1. While standing in the waiting room next to the conference room, Plaintiff's wife states that she heard Judge Wilson's law clerk address the attorneys for Plaintiff, his wife, and their children, and advise that the Court has "reviewed many allegations of mental health," including accusations of a mental health diagnosis, which Judge Wilson found "concerning." Dkt. No. 152, ¶¶ 2-4.

Thereafter, Plaintiff and his wife entered the courtroom and Judge Wilson began the proceeding by noting that he has received "some CPS disclosure from Essex County, New York, and DSS in New Hampshire." Dkt. No. 164-1 at 2. The attorney for I.L. and S.L. then acknowledged reviewing documents from New Hampshire officials, which she stated made her "wary of the mental of the parents." *Id.* at 3. This attorney, as well as the attorney for Plaintiff's wife, also indicated to the court that Warren County records had not yet been made available. *Id.*

---

[7] Defendants deny providing the Family Court with Defendant Raymond's seven-day assessment or any other documentation prior to the proceeding. Dkt. No. 157-3, ¶ 7; Dkt. No. 157-4, ¶¶ 5-7, 9; Dkt. No. 157-6, ¶¶ 18-21, 24.

After further discussion, Judge Wilson stated that the Warren County investigation remained ongoing, but that he had "seen some of the CPS disclosure that's filed already." Dkt. No. 164-1 at 5. Judge Wilson then stated that he shares the same concerns as the children's attorney based on the documents he had reviewed, and asked whether either of the parents had received mental health treatment in the past. *Id*. at 6. After Judge Wilson was informed that they had not, Plaintiff and his wife agreed to undergo psychological evaluations. *Id*. at 9. The proceeding concluded with Plaintiff's wife's attorney asking for access to the documents reviewed by the Family Court and the children's attorney, which Judge Wilson denied at that time. *Id*. at 14-15.

On March 15, 2018, Defendant Lord emailed a representative from Warren County Family Court to advise that DSS was still investigating the case involving Plaintiff and his family. Dkt. No. 139-12 at 1. On April 2, 2018, Defendant Lord emailed another Warren County Family Court representative to advise that the investigation remained open. *Id*. at 2.

That same day, Plaintiff, his wife, and Lacey Ferguson attended another Family Court proceeding. Dkt. No. 164-2. Judge Wilson began this proceeding by noting that the results of the 1034 investigation from Warren County DSS officials had not yet come in, and stating that he had reviewed "a home study CPS disclosed from Essex County, New York, and from Cheshire County in New Hampshire." *Id*. at 2. Thereafter, Judge Wilson discussed Plaintiff and his wife moving out of Lacey Ferguson's residence, which was Plaintiff and his wife's preference according to their attorneys and Plaintiff. *See* Dkt. No. 164-2 at 8-10, 12.

Between April 2 and 4, 2018, Plaintiff and his wife underwent psychological evaluations performed by Psychologist, Dr. Merrigan. Dkt. No. 127 at 47-49.

8

On April 13, 2018, Defendant Lord sent an email (hereinafter, the "Lord Email") to a representative from the Warren County Family Court regarding the DSS investigation, and expressed "concerns" about the situation, as well as an opinion that it would be difficult for the needs of Plaintiff's children to be met as long as Plaintiff and his wife continued living in Lacey Ferguson's home. Dkt. No. 139-12 at 4.

On or about April 15, 2018, Dr. Merrigan sent the Warren County Family Court a Psychological Report based on his evaluations of Plaintiff and his wife. *Compare* Dkt. No. 157-7, ¶ 50 *with* Dkt. No. 143, ¶ 50; Dkt. No. 139-4 at 166-68; Dkt. No. 127 at 47-49. On April 16, 2018, another Family Court proceeding was held regarding the custody of Plaintiff's children. *Compare* Dkt. No. 157-7, ¶ 49 *with* Dkt. No. 143, ¶ 49; Dkt. No. 139-4 at 269-70. According to Plaintiff and his wife, during the proceeding, Judge Wilson ordered that they move out of Lacey Ferguson's residence without their children. Dkt. No. 139-4 at 169; Dkt. No. 139-5 at 43; *see also* Dkt. No. 139-8 at 57-58. At the conclusion of the proceeding, Judge Wilson also ruled that the parties, *i.e.*, Plaintiff and his wife on the one hand and Lacey Ferguson on the other, would have joint legal custody of I.L. and S.L., and Plaintiff and his wife could have unsupervised visits with their children outside of Lacey Ferguson's residence, but Lacey Ferguson would continue to have primary physical custody, and the children could not stay overnight with their parents. Dkt. No. 139-4 at 269-70. Judge Wilson's rulings were memorialized in a Second Temporary Order of Custody entered on May 7, 2018, which expressly states that the Family Court "relied" on "Family Court's child protective records" in making the order. *Id.*

On April 18, 2018, Lacey Ferguson brought Plaintiff, his wife, and their two children to

the residence of Phyllis Jacobs, Emily Whipple's grandmother, where the family lived together until May 4, 2018. Dkt. No. 139-4, at 144-145; *Compare* Dkt. No. 157-7, ¶ 61 *with* Dkt. No. 143, ¶ 61.

On April 26, 2018, Defendant Hoerter was assigned to the LeClair family to "encourage and facilitate the use of DSS' preventive services[.]" Dkt. No. 157-5, ¶ 2. That same day, Defendant Hoerter and her supervisor, Sarah Lord, met with Plaintiff's wife and Lacey Ferguson at Lacey Ferguson's residence to discuss preventive services. *Id*., ¶¶ 2, 7; Dkt. No. 139-11, at 86-98, 236-37. Following the meeting, Defendant Hoerter completed a Family Assessment and Service Plan, which was provided to Plaintiff's wife. Dkt. No. 139-11 at 86-99.

On April 27, 2018, Defendant Raymond sent a nine (9) page Child Protective Services ("CPS") investigation summary (hereinafter, the "Raymond Report") to the Warren County Family Court. *Compare* Dkt. No. 157-7, ¶ 56 *with* Dkt. No. 143, ¶ 56; Dkt. No. 139-8 at 12-20. The Raymond Report found, based on Defendant Raymond's observations, as well as information obtained through interviews, collateral sources, and records from the New Hampshire Division for Children, Youth and Families, that the allegations against Plaintiff and his wife ██████████████████████████████████████████████ ███████████ which originated in New Hampshire, were all substantiated. *Compare* Dkt. No. 157-7, ¶ 103 *with* Dkt. No. 143, ¶ 103; *see also* Dkt. No. 139-12, at 8.

███████████████████████████████

████████████████████████████████████

███████████████████████████████████

███████████████████████████████████



Dkt. No. 138-11 at 13-15.

Prior to submitting the report, Defendant Raymond discussed her decision to

substantiate the allegations of maltreatment with Defendants Lord and Breen, who both agreed with this conclusion based on the documents provided by New Hampshire officials and Defendant Raymond's stated observations during her investigation. Dkt. No. 157-4, ¶¶ 12-13; Dkt. No. 157-3, ¶¶ 12-13. According to Plaintiff, the Raymond Report contains numerous false statements, including statements refuted by exculpatory evidence that Defendant Raymond never requested from Plaintiff or his wife. Dkt. No. 139-4 at 90-92; Dkt. No. 131-2, ¶¶ 11-17, 23.

On May 2, 2018, the Court-appointed attorney for I.L. and S.L. filed an Order to Show Cause with the Family Court to have Plaintiff's children returned to Lacey Ferguson, which Judge Wilson granted. *See* Dkt. No. 75-1 at 8-9. According to Plaintiff, the Order to Show Cause was filed based on the attorney's review of "false DSS Preventive Service reports" regarding the safety and well-being of the children. Dkt. No. 131-2, ¶ 29; *see also* Dkt. No. 139-4 at 145-46. On May 4, 2018, Plaintiff's children were returned to Lacey Ferguson's home, where they remained leading up to the next Family Court appearance on May 8, 2018. Dkt. No. 139-4, at 145-149.

During the Family Court appearance on May 8, 2018, Judge Wilson ruled that Lacey Ferguson would continue to have primary physical custody of I.L. and S.L., and Plaintiff and his wife would be allowed unsupervised visits during identified time periods, which was memorialized in a Third Temporary Order of Custody entered on May 14, 2018. Dkt. No. 139-4 at 271. The Third Temporary Order of Custody expressly states that the Family Court "relied" on "Family Court's child protective records" in making the order. *Id*.

On May 29, 2018, Defendant Hoerter and her supervisor, Tracy Terry, met with Plaintiff's wife at Phyllis Jacobs' residence, where she and Plaintiff were residing. Dkt. No.

139-11 at 249-51; Dkt. No. 127 at 59-61. During the meeting, Defendant Hoerter and Terry discussed, among other things, the goals outlined in the Family Assessment and Service Plan. Dkt. No. 139-11 at 249-51; Dkt. No. 127 at 59-61.

On June 11, 2018, the parties attended another Family Court proceeding. Dkt. No. 139-4 at 272-73. At the proceeding, Judge Wilson modified the times for Plaintiff and his wife's unsupervised visits with their children, but maintained the duration of the allowed weekly visitations, which was memorialized in a Fourth Temporary Order of Custody entered on July 12, 2018. *Compare* Dkt. No. 157-7, ¶ 67 *with* Dkt. No. 143, ¶ 67; Dkt. No. 139-4 at 272-73.

Following the Court proceeding, Defendant Hoerter and Tracy Terry met with Plaintiff and his wife to provide them with a preventive application for services. Dkt. No. 139-11 at 253. Four days later, Defendant Hoerter updated the Family Assessment and Service Plan to note, among other things, that (1) I.L. and S.L. attended well visits at Warrensburg Health Center and were seen by a pediatrician who stated that each appeared "physically healthy," (2) Plaintiff and his wife completed the paperwork for Preventive Services, (3) Plaintiff was working full time, (4) Plaintiff and his wife signed a lease for their own apartment, and (5) the psychological evaluation performed on Plaintiff did not recommend mental health treatment. Dkt. No. 139-11 at 102-116; Dkt. No. 75-1 at 18-21.

Between June 25 and July 9, 2018, while I.L. and S.L. were in Lacey Ferguson's exclusive care, Plaintiff claims they suffered injuries and reported being physically hurt by their grandmother and uncle. Dkt. No. 139-4 at 37-42, 87, 105, 119-20. Plaintiff further states that on June 25, June 27, July 6, and July 9, 2018, reports of child abuse were made to DSS officials, including Defendants Raymond and Hoerter, but these reports were never

13

thoroughly investigated, and instead covered up. *Id*. at 119-20; Dkt. No. 131-2 at ¶¶ 33, 38-43.

On July 18, 2018, the parties attended another Family Court proceeding. Dkt. No. 139-11 at 167-68. At the proceeding, Judge Wilson awarded Plaintiff and his wife joint legal and physical custody of their children, and awarded Lacey Ferguson visitation on a two-week schedule, wherein she would have them for a four hour period on Wednesday of the first week and for a nineteen-hour period from Wednesday to Thursday on the second week. *Id*. The custody and visitation schedule was memorialized in a Fifth Temporary Order of Custody executed on August 7, 2018. *Id*.

On or about July 24, 2018, a representative from the Warren County Probation Department conducted a home study of Plaintiff's residence, and interviewed Plaintiff and his wife. Dkt. No. 139-4 at 161-64; Dkt. No. 127-1 at 36-38. Following the home study, a report was prepared and sent to the Warren County Family Court. Dkt. No. 139-4 at 161-64; Dkt. No. 127-1 at 36-38.

According to Plaintiff and his wife, Defendant Raymond entered their residence without permission on or about August 14, 2018. Dkt. No. 139-4 at 184-202; Dkt. No. 139-5 at 64-70. Defendant Raymond denies ever entering Plaintiff's residence uninvited. Dkt. No. 157-6, ¶ 32. On the date of the alleged unlawful entry, there was no ongoing CPS investigation against Plaintiff. *Compare* Dkt. No. 157-7, ¶ 97 *with* Dkt. No. 143, ¶ 97.

On August 22, 2018, Judge Wilson held a final court proceeding regarding Plaintiff's custody of his children. *Compare* Dkt. No. 157-7, ¶ 69 *with* Dkt. No. 143, ¶ 69. During the proceeding, the parties stipulated to a custody arrangement wherein Plaintiff and his wife would have full legal and physical custody of their children, and Lacey Ferguson would be

14

allowed visitation every other Sunday for six (6) hours, which was memorialized in a Final Order of Custody and Visitation executed on October 9, 2018. Dkt. No. 139-4 at 274-75.

According to Plaintiff, the aforementioned actions of Defendants Raymond, Hoerter, Breen, and Lord occurred, at least in part, because Warren County has a "de facto policy of abusing the family court process by fabricating [government] records against poor and uneducated families to remove, withhold, and place young and desirable children" such as I.L. and S.L. Dkt. No. 131-2, ¶ 16.

## III.    MOTIONS FOR SUMMARY JUDGMENT

### A.    Relevant Legal Standard Regarding Summary Judgment

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86

15

(1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted).

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id*. (citation and internal quotation marks omitted). "To defeat summary judgment, . . . nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id*. (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the pro se party's] supporting papers

liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93-CV-5981, 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## B.    Fourteenth Amendment Substantive Due Process Claims

Plaintiff contends that he is entitled to summary judgment with respect to his due process claims against Defendants Raymond and Hoerter because the evidence in the record shows that (1) Defendant Raymond made false statements in her case notes and report submitted to Warren County Family Court regarding I.L. and S.L.'s medical history, and Plaintiff's mental health, (2) Defendant Hoerter implied that Plaintiff suffered from mental health issues in her preventive records, and (3) both officials failed to accurately investigate and record abuse allegations against Lacey Ferguson, which collectively resulted in, or contributed to, Plaintiff's separation from his children for several months. *See generally*, Dkt. No. 131-1. Plaintiff further argues that he is entitled to summary judgment with respect to his due process claims against Defendants Breen, Lord, and Warren County because Defendant Breen and Lord reviewed and approved the records created by Defendants Raymond and Hoerter, in furtherance of the County's policy of acting with deliberate indifference to familial rights. *Id.*

On the other hand, Defendants contend that they are entitled to summary judgment with respect to Plaintiff's due process claims because (1) the undisputed record shows that the Warren County Family Court did not rely on any records created by Defendant Hoerter in

17

reaching its custody decisions, (2) the findings in the Raymond Report were based largely on information from New Hampshire officials and collateral sources, and it did not influence the Warren County Family Court proceeding, (3) Defendants Lord and Breen did not take actions that violated Plaintiff's constitutional rights, (4) Defendants Raymond, Hoerter, Lord and Breen are entitled to immunity under Social Service Law and federal law, and (5) there is no evidence in the record that Plaintiff suffered a violation of his rights as a result of a Warren County custom, policy, or practice. *See* Dkt. No. 157-2 at 7-16.

"It is well settled that parents have 'a constitutionally protected liberty interest in the care, custody and management of their children.'" *McCaul v. Ardsley Union Free Sch. Dist.*, 514 Fed. App'x 1, 3 (2d Cir. 2013) (quoting *Southerland v. City of N.Y.*, 680 F.3d 127, 142 (2d Cir. 2011)). "Although parents enjoy a constitutionally protected interest in their family integrity, this interest is counterbalanced by the 'compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves.'" *Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 104 (2d Cir. 1999) (quoting *Manzano v. South Dakota Dep't of Social Servs.*, 60 F.3d 505, 510 (8th Cir. 1995)). The government's interest, "though compelling, is not so compelling as to derogate a parent's constitutional rights completely. Case workers cannot be free to substantiate a claim of abuse, for instance, by ignoring overwhelming exculpatory information or by manufacturing false evidence." *Id*. "[S]hort of these obvious extremes . . . [a]n investigation passes constitutional muster provided simply that case workers have a 'reasonable basis' for their findings of abuse." *Id*.; *see also Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 275 (2d Cir. 2011) ("Only the most egregious official conduct can be said

to be arbitrary in the constitutional sense and therefore unconstitutional." (quoting *Tenenbaum v. Williams*, 193 F.3d 581, 600 (2d Cir. 1999))).

"In applying a reasonableness standard in the abuse context, courts must be especially sensitive to the pressurized circumstances routinely confronting case workers, circumstances in which decisions between 'difficult alternatives' often need to be made on the basis of limited or conflicting information." *Russell*, 182 F.3d at 105 (citation omitted). "[A] mere failure to meet local or professional standards, without more, should not generally be elevated to the status of constitutional violation." *Id*. at 106 (citation omitted). "As a result, even a faulty investigation does not necessarily rise to the level of an unconstitutional investigation." *Id*.; *Kenific v. Oswego Cty*., No. 5:07-CV-0213 (GTS), 2010 WL 2977267, at *13 (N.D.N.Y. July 23, 2010) ("This conscious-shocking requirement constitutes one of the elements necessary to state a claim for a violation of the Fourteenth Amendment under 42 U.S.C. § 1983. Among the other elements (which include the fact that the defendants were acting under the color of state law and the fact that defendants' conduct caused an injury to the plaintiff) is the requirement that, when they acted, defendants possessed a state of mind more blameworthy than carelessness or negligence."); *V.S. v. Muhammad*, 595 F.3d 426, 431 (2d Cir. 2010) (concluding that even if the caseworker had been aware that the presiding doctor had a "reputation" for over-diagnosing child abuse, it was not unreasonable for them to rely on the doctor's diagnosis when her opinion was shared by other doctors).

Furthermore, even when there is egregious conduct, "[w]here there is no actual loss of custody, no substantive due process claim can lie." *Cox*, 654 F.3d at 276 (citations omitted).

### 1. Raymond

As noted, Plaintiff contends that Defendant Raymond's investigative materials, as well as the Raymond Report, are replete with false and misleading information, which, along with the Lord Email, impacted his custodial relationship with his children. *See generally*, Dkt. No. 131-1.

### (a) Investigative Materials

Plaintiff speculates that Defendant Raymond's investigative notes were submitted to, or accessible by, Warren County Family Court because (1) Judge Wilson's first order entered on February 16, 2018, required Warren County DSS to submit a seven-day report to the Family Court, (2) each of Judge Wilson's Temporary Orders of Custody included language that the Family Court "relied" on "child protective records" in making the order, and (3) weeks before the Raymond Report was submitted, Judge Wilson ordered that Plaintiff and his wife undergo psychological evaluations based on his stated "concerns" regarding mental health issues, which he based on CPS documents he had reviewed. *See id*. at 2-5; Dkt. No. 151 at 29-33; Dkt. No. 152, ¶¶ 1, 8-12; Dkt. No. 164-1. However, Defendants have provided sworn statements that records created by Defendant Raymond other than the Raymond Report were never submitted to, or accessible by, Warren County Family Court. *See* Dkt. No. 157-3, ¶¶ 6-9; Dkt. No. 157-4, ¶¶ 5-9; Dkt. No. 157-6, ¶¶ 18, 20-21, 24. In an effort to rebut these sworn statements, Plaintiff has submitted an affidavit from his wife, Emily Whipple, as well as two personal affidavits, and transcripts from two Family Court proceedings. Dkt. No. 151 at 29-33; Dkt. No. 152; Dkt. No. 164-1; Dkt. No. 164-2.

Emily Whipple's affidavit states that Judge Wilson ordered psychological evaluations

at a proceeding on March 14, 2018, based on "concerns" regarding mental health issues. *See generally*, Dkt. No. 152. The transcript from this proceeding confirms that Judge Wilson expressed "concerns" regarding the mental health of Plaintiff and his wife based on documents he had reviewed.

The affidavit, however, lacks any credible statement that the "concerns" expressed by Judge Wilson were derived from information provided to him by Warren County DSS officials, and the transcript of the proceeding makes clear that the documents reviewed by the Family Court as of March 14, 2018, were documents provided from Essex County and New Hampshire officials. *See* Dkt. No. 164-1 at 2-3, 14-15. Furthermore, the evidence in the record shows that a representative from the Warren County Family Court spoke with Karen Atkins, a Child Protective Services Supervisor for the New Hampshire Division for Children, Youth and Families, about obtaining documentation from her agency on February 13, 2018, *i.e.*, prior to the Family Court ordered investigation. Dkt. No. 139-8 at 100.[8] In other words, even accepting the statements in the affidavit as true, Judge Wilson's concerns about mental health issues at a proceeding that pre-dated the Raymond Report does not establish that Warren County DSS officials are lying in their sworn statements indicating that no Warren County DSS records other than the Raymond Report were provided to, or accessible by, the Warren County Family Court.

Separately, Plaintiff's affidavits detail his conversations with Donna Hammel, Deputy Clerk of Warren County Family Court, and "a Child Abuse Prevention Specialist 1" named "Racheal[,]" who each informed him that in response to a court-ordered investigation like the

---

[8] It would also be unprecedented for documents filed in the New Hampshire Family Court proceeding to not be sent to the Warren County Family Court as part of the jurisdictional transfer of the case.

one ordered by Judge Wilson on February 16, 2018, DSS would file the requested reports on the dates the Judge ordered, or ask for more time to comply. *See* Dkt. No. 151 at 29, 31. Plaintiff also states that Ms. Hammel advised him that if the Family Court ordered Preventive Services to file information, that information would have been filed. *Id*. at 29-30.

While the Court is sympathetic to the difficulties faced by pro se plaintiffs, particularly with respect to obtaining discovery from non-party government officials, the aforementioned statements from Ms. Hammel and "Racheal" are hearsay, and cannot be considered in resolving the pending motions. *See* Fed. R. Civ. P. 56(c)(4); *Sarno v. Douglas Elliman–Gibbons & Ives, Inc*., 183 F.3d 155, 160 (2d Cir. 1999) (plaintiff's assertion in affidavit  concerning what a third party told plaintiff insufficient to create issue of fact where plaintiff did not submit sworn statement from the third party); *Schweit v. City of New York*, No. 04-CV-5462, 2007 WL 1133440, at *7 (E.D.N.Y. Apr. 17, 2007) (plaintiff's assertions concerning what other people told him were "inadmissible hearsay and may not be relied upon to defeat summary judgment motions").  In any event, the evidence in the record shows that Warren County DSS officials regularly communicated with the Family Court that their investigation was ongoing after Judge Wilson's initial order, and before the Raymond Report was submitted, which is consistent with the statements from Ms. Hammel and "Racheal" that DSS officials either comply with court-ordered deadlines or ask for additional time. *See* Dkt. No. 139-12 at 1-5.  Thus, the affidavits of Ms. Hammel and "Racheal" are also insufficient to create a genuine issue of material fact regarding whether or not documents other than the Raymond Report were submitted by Warren County DSS officials to the Warren County Family Court.

Since no reasonable factfinder could conclude from the record evidence before this Court that any of Defendant Raymond's investigative materials, aside from the Raymond Report, were viewed by Warren County Family Court, Defendants' motion for summary judgment is granted and Plaintiff's motion for summary judgment is denied insofar as Plaintiff's substantive due process claim against Defendant Raymond is based on any records she created other than the Raymond Report. *See Kenific*, 2010 WL 2977267, at *13 (N.D.N.Y. July 23, 2010) (noting that to establish a constitutional violation, including a Fourteenth Amendment due process violation, a plaintiff must establish "that defendants' conduct caused an injury to the plaintiff").

### (b) Lord Email

The Lord Email noted that Plaintiff and his wife continue to interfere with Lacey Ferguson's efforts to obtain services for I.L. and S.L., and that "difficulties" would continue as long as they remained living at Lacey Ferguson's residence. Dkt. No. 139-12 at 4. Based on the evidence in the record, the Court can only conclude that the statements in the Lord Email originated from Defendant Raymond. *See* Dkt. No. 139-8 at 56; Dkt. No. 157-4, ¶¶ 12-13, 16; Dkt. No. 139-4 at 172.

As an initial matter, none of the statements in the Lord Email relate to the abuse allegations or Plaintiff's parenting abilities, and the statement in the Lord Email that "difficulties" would continue as long as they remained living at Lacey Ferguson's residence was an expression of opinion based on Defendant Raymond's professional judgment. Thus, this communication is not the sort of conduct that ordinarily gives rise to a substantive due process claim. *See Russell*, 182 F.3d at 104 (noting that short of the "extreme" conduct of

"substantiat[ing] a claim of abuse . . . by ignoring overwhelming exculpatory information or by manufacturing false evidence[,] . . . [a]n investigation passes constitutional muster provided simply that case workers have a 'reasonable basis' for their findings of abuse").

Furthermore, at the time the Lord Email was sent, Lacey Ferguson had physical custody of I.L. and S.L. Thus, the opinion expressed regarding the needs of the children was based on the nature of the custodial arrangement at that time. *See Gorman v. Rensselaer Cnty.*, 910 F.3d 40, 48 (2d Cir. 2018) (noting that to show a substantive due process violation, a plaintiff must demonstrate "that state action was specifically intended to interfere with the family relationship[,]" and holding that plaintiff's claim that defendant impaired the relationship between him and his sister "was at best the indirect and incidental result of [the defendant's] conduct."). In addition, no reasonable factfinder could conclude from the evidence in the record that the statements and expressions of opinion in the Lord Email were fabricated, or made based on a blatant disregard for the truth.

In short, even assuming the Lord Email influenced Judge Wilson's decision to order Plaintiff and his wife to move out of Lacey Ferguson's residence without their children, no reasonable factfinder could conclude that the contents of the email violated Plaintiff's substantive due process rights. Accordingly, Defendants' motion for summary judgment is granted and Plaintiff's motion for summary judgment is denied insofar as Plaintiff's substantive due process claim against Defendant Raymond is based on the Lord Email.

### (c) Raymond Report

Plaintiff identifies several statements in the Raymond Report that he believes were false and/or materially misleading, which relate to his mental health, his children's medical care, and Lacey Ferguson. For example, Plaintiff contends that the statements in the report

that he "is paranoid[,]" "believes that the government implanted a chip in him to track him[,]" has "told family members that people were trying to poison them[,]" will not "touch anything with his skin and cover[s] vents [due to fear] of getting poisoned[,]" and will not let his son play on the floor due to a "fear of germs[,]" are false, and belied by actions and behavior observed by or communicated to Defendant Raymond, which are omitted from the report. Dkt. No. 131-1 at 12, 15, 18-21, 24-25.

In addition, Plaintiff takes issue with statements in the report regarding the medical treatment received by I.L. and S.L., such as the statement that Plaintiff's children "had not been seen by a pediatrician since birth, until they were placed in Foster Care[,]" which is refuted, at least with respect to I.L., by evidence in the record that was available to Defendant Raymond at the time. *See* Dkt. No. 131-1 at 5, 7-8, 19-20.[9] ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ Dkt. No. 139-8 at 38.[10]

Plaintiff also argues that the Raymond Report is materially misleading with respect to Lacey Ferguson's fitness to care for I.L. and S.L., who had only brief interactions with her

---



25

prior to February, 2018. Dkt. No. 131-1 at 18-19. ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ *Id.*; *see also* Dkt. No. 139-8 at 26. In addition, Defendant Raymond never interviewed Emily Whipple about her mother, and any potential issues with her caring for I.L. and S.L. outside the presence of their parents. *See* Dkt. No. 127-1 at 49-51, 84-87.[11]

The majority of the aforementioned statements that Plaintiff contends are false were made by third parties to New Hampshire officials, and are expressions of opinion. While Plaintiff is certainly free to disagree with the accuracy of such statements, that does not mean that Defendant Raymond falsified information in her report by virtue of documenting these third-party statements.

Furthermore, even assuming a reasonable factfinder could potentially conclude that Defendant Raymond's investigation was incomplete because she failed to question Plaintiff or his wife about the statements made to New Hampshire officials regarding his mental health, and his children's lack of medical treatment, a lack of thoroughness is not enough to establish a substantive due process violation. *See Cunney v. Bd. of Trustees of Vill. of Grand View*, 660 F.3d 612, 626 (2d Cir. 2011) ("Substantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional

---

[1] ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

sense, but not against government action that is incorrect or ill advised." (internal quotation marks omitted)); *Kia P. v. McIntyre*, 2 F. Supp. 2d 281, 293 (E.D.N.Y. 1998) ("The Constitution does not grant . . . an independent right [to an adequate child abuse investigation]."), *aff'd*, 235 F.3d 749 (2d Cir. 2000) (dismissing substantive due process claim where municipal agency placed a hold on a newborn's release from hospital because "the results of the initial toxicology screen, taken together with [mother]'s history of substance abuse, gave the [h]ospital and [agency] a reasonable basis to believe that [the child] was in danger of abuse or neglect, and clearly justified their limited actions").

Lastly, with respect to the statements in the Raymond Report regarding Defendant Raymond's personal observations, such statements are limited, and not entirely adverse to Plaintiff. ███████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
████████████████████████████████████████████

Moreover, although the Raymond Report contains an expression of concern regarding Plaintiff's mental health, this statement is based on both "observed behavior" and Plaintiff's "refus[al] to admit any wrong doing" with respect to the events that resulted in his children's placement in foster care. Dkt. No. 139-8 at 19-20. Plaintiff, of course, disagrees with Defendant Raymond's belief that his denials about wrongdoing and statements about being "targeted" by New Hampshire officials are grounds for expressing concern about his mental health. However, no reasonable factfinder could conclude that it was outrageous or conscience-shocking for Defendant Raymond to express concern in the report, or in

27

supervisor that were relayed to the Family Court, particularly in light of the statements provided by Plaintiff's stepmother and Lacey Ferguson to New Hampshire officials.

In light of the foregoing, Plaintiff has failed to create a triable issue of fact on his substantive due process claim against Defendant Raymond based on her investigation and report. *See, e.g., Cornejo v. Bell*, 592 F.3d 121, 129 (2d Cir. 2010) ("[T]his Court has found no constitutional violation where caseworkers allegedly committed 'sins of commission and omission in what they told and failed to tell . . . the Family Court Judge.'") (quoting *van Emrik v. Chemung Cty. Dep't of Soc. Servs*., 911 F.2d 863, 866 (2d Cir. 1990)); *Kia P.*, 2 F. Supp. 2d at 293. At a minimum, Defendant Raymond is entitled to qualified immunity with respect to Plaintiff's due process claim against her. *See, e.g., Thomas v. Digglio*, No. 15-CV-3236, 2016 WL 7378899, at *12 (E.D.N.Y. Dec. 20, 2016) (finding that defendant caseworkers who removed children from their home were entitled to qualified immunity because "[a]t most, plaintiff [was] arguing that the caseworkers should have done a more thorough investigation, but that is a simple negligence claim, not the kind of willful or reckless indifference that overcomes qualified immunity").

Furthermore, even if a reasonable factfinder could conclude that Defendant Raymond's investigation and report violated Plaintiff's due process rights, his claim against Defendant Raymond is also subject to dismissal because no reasonable factfinder could conclude from the evidence in the record that any of the statements in the Raymond Report had any impact on Plaintiff's custodial rights. *See Rahman v. Fisher*, 607 F. Supp. 2d 580, 584 (S.D.N.Y. 2009) ("A defendant's conduct must be a proximate cause of the claimed violation in order to find that the defendant deprived the plaintiff of his rights." (quoting

*Martinez v. California*, 444 U.S. 277, 285 (1980))).

For starters, the evidence in the record shows that Plaintiff and his wife consented to the First Temporary Order of Custody. *See* Dkt. No. 139-8 at 165-181; Dkt. No. 139-4 at 267-268. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████ █

Thereafter, and several weeks before the Raymond Report was submitted, Judge Wilson asked Plaintiff and his wife to submit to psychological evaluations. *See* Dkt. No. 152; Dkt. No. 127 at 47-49. Simply put, the evidence in the record shows that Judge Wilson had concerns regarding potential mental health issues for Plaintiff and/or his wife before the Raymond Report detailed its own concerns.

The psychological evaluations were submitted to the Family Court on or about April 15, 2018, and according to Plaintiff, at the Family Court proceeding held on April 16, 2018, Judge Wilson stated that he saw "no red flags" in the evaluations. Dkt. No. 139-4 at 168-169; Dkt. No. 127 at 47-49. Nonetheless, according to Plaintiff, Judge Wilson ordered him and his wife to move out of the Lacey Ferguson's residence without their children, and prohibited them from having overnight visits with their children. Dkt. No. 139-4 at 169, 269-270. As of this date, the only substantive communication between Warren County DSS officials and the Family Court was the Lord Email, which did not raise concerns regarding Plaintiff's mental health or the children's medical care.

Eleven days after this proceeding, the Raymond Report was submitted to the Family

Court.  At the ensuing Family Court proceeding, Judge Wilson extended Plaintiff's access to his children by allowing overnight visits for the first time, and eliminating the requirement in his prior orders that Plaintiff's access to his children occur on dates and times agreed to by Lacey Ferguson.  Then, roughly two months later, and despite no record evidence of any additional documents having been submitted to the Family Court that contradicted any of the statements in the Raymond Report, Judge Wilson awarded Plaintiff and his wife primary physical custody of their children.

If the Raymond Report had negatively influenced Judge Wilson's thinking regarding Plaintiff's custodial rights, Judge Wilson would not have expanded these rights at the first hearing after the report was submitted, and then awarded Plaintiff and his wife primary physical custody roughly two months later, without any new information contradicting any of the alleged false or misleading statements in the report.  In other words, no reasonable factfinder could conclude from the evidence in the record that Defendant Raymond's conduct caused the claimed violation.

Based on the foregoing, Defendants' motion for summary judgment with respect to Plaintiff's Fourteenth Amendment claim against Defendant Raymond is granted, Plaintiff's competing motion for summary judgment with respect to this claim is denied, and the claim is dismissed.

### 2. Hoerter

Defendants have provided sworn statements showing that none of the records created by Defendant Hoerter were ever provided to, or accessible by, the Warren County Family Court.  Dkt. No. 157-5, ¶¶ 4, 13; Dkt. No. 157-4, ¶¶ 5-6, 10.  In response, Plaintiff simply speculates that preventive records must have been reviewed by the Family Court Judge

30

because the documents were ordered to be filed with the court, are mentioned in court orders, and are not "confidential" under Social Security Law § 422.  Dkt. No. 151 at 21-22.

Aside from Plaintiff's vague and self-serving statement in his opposition memorandum of law, there is no evidence in the record that the Family Court Judge ordered preventive records to be submitted to the court.  Moreover, the Family Court's custody orders state only that the Family Court "searched the statewide registry for orders of protection, the sex offender registry and Family Court's child protective records" and "relied on" the results of its search in making its order.  *See, e.g.*, Dkt. No. 139-4 at 269-74.

Setting aside the undefined nature of the term "child protective records," Judge Wilson's orders further state that all records relied upon have "been disclosed to the parties[.]"  *See, e.g.*, Dkt. No. 139-4 at 269-74.  Prior to June 18, 2018, Plaintiff was represented by counsel in the Family Court proceeding.  *See* Dkt. No. 131-2 at ¶ 37.  Yet Plaintiff has failed to offer any evidence showing that he or his attorney were notified that Judge Wilson considered preventive case records in rendering any of his decisions.  Thus, there is no evidence in the record from which a reasonable factfinder could conclude that any document created by Defendant Hoerter was reviewed by Judge Wilson.

Furthermore, even if the Court were to assume that the Family Court reviewed preventive records created by Defendant Hoerter, the evidence in the record makes clear that Defendant Hoerter never made any decisions or recommendations regarding allegations of maltreatment, abuse, or neglect.  *See* Dkt. No. 157-5, ¶ 5; Dkt. No. 139-12.  It is also clear from the record that at the time Defendant Hoerter first met Plaintiff and his wife, they had already been ordered to move out of Lacey Ferguson's house without their children. Moreover, it is undisputed that (1) the Family Assessment and Service Plan created on or

about April 26, 2018, was updated on June 15, 2018, and (2) at the next Family Court proceeding after June 15, 2018, Judge Wilson awarded Plaintiff and his wife joint legal and physical custody of their children for the first time. In light of these facts, no reasonable factfinder could conclude that Defendant Hoerter's preventive records had a negative effect on Plaintiff's custody dispute (assuming, again, that such records were reviewed by the Court in the first instance).[12]

Accordingly, Defendants' motion for summary judgment with respect to Plaintiff's Fourteenth Amendment claim against Defendant Hoerter is granted, Plaintiff's competing motion for summary judgment with respect to this claim is denied, and the claim is dismissed.

### 3. Lord and Breen

Plaintiff's substantive due process claim against Defendants Lord and Breen is based on them approving findings, recommendations, and records created by Defendants Raymond and Hoerter. *See* SAC, ¶¶ 29, 31, 49, 74; August 2020 Order at 23-24; Dkt. No. 131-1 at 7, 15.

"In order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, inter alia, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). Traditionally, the Second Circuit held that personal involvement of supervisory officials like Defendants Lord and Breen could be shown in several ways. In addition to (1) direct

---

[12] Insofar as Plaintiff contends that Defendant Hoerter failed to record certain claims of abuse against Lacey Ferguson in her preventive notes, the Court has already ruled that an alleged failure of any of the Defendants to intervene and stop alleged abuse of I.L. or S.L. following their placement with their maternal grandmother, which is said to have led to further abuse of the child, is not a violation of the due process clause because the person allegedly causing the injury was a private citizen, and not a state actor. *See* March 2019 Report-Recommendation and Order at 18-19 (citing *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989)); July 2019 Order (adopting March 2019 Report-Recommendation and Order in its entirety).

participation, a plaintiff could show that:

> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the [constitutional] rights . . . by failing to act on information indicating that unconstitutional acts were occurring

(the "*Colon* factors"). *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (quoting *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986)).

The Second Circuit, however, recently held that the *Colon* test was abrogated by the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  *See Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020).  Specifically, the Second Circuit held as follows:

> [A]fter *Iqbal*, there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676, 129 S. Ct. 1937. "The factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue" because the elements of different constitutional violations vary. *Id*. The violation must be established against the supervisory official directly.

*Tangreti*, 983 F.3d at 618.  Although *Tangreti* was decided in the context of an Eighth Amendment deliberate indifference claim against a prison official, and therefore did not specify the "factors necessary" to establish a substantive due process claim against a DSS supervisory official, the Court need not address this issue because it is clear that Plaintiff cannot establish a constitutional claim against Defendants Lord and Breen in light of the dismissal of his due process claims against Defendants Raymond and Hoerter.  *See Blyden*

33

*v. Mancusi*, 186 F.3d 252, 265 (2d Cir. 1999) ("[F]or a supervisor to be liable under [§] 1983, there must have been an underlying constitutional deprivation.").

The Court will add only that survival of Plaintiff's due process claim against either Defendant Hoerter or Defendant Raymond would not trigger a different result. That is because there is no evidence in the record showing that either Defendant Lord or Defendant Breen approved the inclusion or omission of any information in any document created by Defendant Hoerter or Defendant Raymond, despite knowing that such information was false, incomplete, or ignored exculpatory evidence. *See Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (noting that "[d]irect participation" means "personal participation by one who has knowledge of the facts that rendered the conduct illegal" (citation omitted)); *McCullough v. Herron*, 838 Fed. App'x 837, 845-46 (5th Cir. 2020) (affirming dismissal of complaint against supervisory officials based on allegations that they "explicitly approved" of a case worker's actions, but "failed to support the conclusory allegation and bare assertions that [the supervisory officials] knew about or approved of any purportedly false statement in [the case worker's] affidavit"); *Chambers v. Santa Clara Cty.*, No. 05-CV-3308, 2007 WL 4191938, at *14 (N.D. Cal. Nov. 26, 2007) (concluding that supervisory officials could not be held liable for alleged wrongdoing of investigating social workers based solely on the supervisory officials being "responsible for the approval of the Social Worker's report . . . . and . . . signed the Social Workers report" because there is no *respondeat superior* liability under Section 1983), *aff'd*, No. 07-17240, 2011 WL 5188102 (9th Cir. Nov. 2, 2011); *Weisman v. Cty. of Los Angeles*, No. 12-CV-10207, 2013 WL 12202618, at *6 (C.D. Cal. June 11, 2013) (finding that in the absence of evidence showing that non-investigating

officials were aware of alleged false statements by investigating case workers, it was "eminently reasonable" for non-investigating officials to "rel[y] on their colleagues' reports and assessments").[13]  In addition, there is no evidence in the record that either Defendant Hoerter or Defendant Raymond had a history of mishandling investigations and/or making egregious recommendations such that any failure to investigate findings or recommendations with respect to Plaintiff and his family may be considered evidence of gross negligence or deliberate indifference to Plaintiff's rights.  *See Raspardo v. Carlone*, 770 F.3d 97, 116-117 (2d Cir. 2014) ("'[G]ross negligence' denotes a higher degree of culpability than mere negligence. It is the kind of conduct where the defendant has reason to know of facts creating a high degree of risk of . . . harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk. . . . A supervisor is not grossly negligent . . . where the plaintiff fails to demonstrate that the supervisor knew or should have known of a problematic pattern of employee actions or where the supervisor took adequate remedial steps immediately upon learning of the challenged conduct."); *Meriwether v. Coughlin*, 879 F.2d 1037, 1047-48 (2d Cir. 1989) ("supervisory liability may be imposed when an official has actual or constructive notice of unconstitutional practices and demonstrates 'gross negligence' or 'deliberate indifference' by failing to act"); *Samuels v. Fischer*, 168 F. Supp. 3d 625, 638 (S.D.N.Y. 2016) (noting that to support a finding of personal involvement on the basis of "the fourth *Colon* factor, i.e., that 'the defendant was grossly negligent in supervising subordinates who committed the wrongful acts[,]' a "plaintiff must show that the defendant knew or should have known that there was a high degree of risk that his subordinates would

---

[13]  It is undisputed that Defendant Breen and Defendant Lord never met Plaintiff, his wife, or their children.  Dkt. No. 139-4 at 172; Dkt. No. 157-3, ¶ 16; Dkt. No. 157-4, ¶ 16.

behave inappropriately, but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury to Plaintiff" (quoting *Colon*, 58 F.3d at 873)). Moreover, Plaintiff has failed to introduce credible evidence establishing the existence of custom, policy, or practice that Defendant Lord or Breen implemented or allowed, which resulted in the alleged wrongdoing by Defendants Raymond and Hoerter.[14]

In short, in addition to Plaintiff's failure to establish an underlying constitutional violation, he has failed to introduce evidence from which a reasonable factfinder could conclude that Defendants Lord and Breen were personally involved in any of the alleged wrongdoing. Furthermore, there is no evidence in the record that the conduct of Defendant Lord or Defendant Breen was unreasonable.

For all of these reasons, Defendants' motion for summary judgment with respect to Plaintiff's Fourteenth Amendment claims against Defendants Lord and Breen is granted, Plaintiff's competing motion for summary judgment with respect to these claims is denied, and the claims are dismissed.

### 4. Warren County

Plaintiff identifies several Warren County "policies" in his Second Amended Complaint that he claims resulted in a deprivation of his substantive due process rights, including "fabricating evidence against a parent in order to support a knowingly false referral for child abuse," "withholding exculpatory evidence," and "assigning DSS agents to friends and family members." SAC, ¶ 73(a)-(j). Plaintiff appears to claim that these policies exist in order to

---

[14] A more detailed discussion of this issue is set forth below in Section III.B.4.

separate children from their families because custody transfers increase DSS funding.  *Id*., ¶ 77.

It is well-established that a municipality may not be held liable under Section 1983 on the basis of *respondeat superior*.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694-95 (1978).  Rather, municipalities are responsible only for "their own illegal acts."  *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986).

"In order to sustain a Section 1983 claim for municipal liability, a plaintiff must show that he suffered a constitutional violation, and that the violation resulted from an identified municipal policy or custom."  *Jeanty v. City of Utica*, No. 6:16-CV-0966 (BKS/TWD), 2021 WL 149051, at *32 (N.D.N.Y. Jan. 14, 2021) (citing *Monell*, 436 U.S. at 694-95).  "A municipal policy or custom may be established by any of the following: 1) a formal policy, officially promulgated by the municipality . . . ; 2) action taken by the official responsible for establishing policy with respect to a particular issue . . . ; 3) unlawful practices by subordinate officials so permanent and widespread as to practically have the force of law . . . ; or 4) a failure to train or supervise that amounts to 'deliberate indifference' to the rights of those with whom the municipality's employees interact[.]"  *Jeanty*, 2021 WL 149051, at *32 (citations omitted).

Because Plaintiff has failed to establish that any of the named Defendants violated his due process rights, his claim against Warren County must be dismissed.  *See Segal v. City of New York*, 459 F.3d 207, 219-20 (2d Cir. 2006) (holding that district court need not reach municipal liability claim where underlying constitutional claims were properly dismissed).

The Court would add only that Plaintiff has presented no evidence that Warren County

(1) has a widespread policy or custom of allowing case workers to present intentionally misleading information, or ignore exculpatory evidence, to substantiate abuse allegations, or (2) systematically fails to train case workers on their roles and responsibilities relative to investigating abuse allegations. Indeed, there is no evidence in the record from which a reasonable factfinder could conclude that any Warren County DSS case worker was previously found to have violated a civilian's constitutional rights in substantiating an abuse allegation.[15] Furthermore, a single incident of wrongdoing, without more, is insufficient to establish the systemic and repeated failure necessary for a "policy or custom" under *Monell*. *See, e.g., Nguedi v. Caulfield*, 813 Fed. App'x 1, 3 (2d Cir. 2020) ("[A] single case is insufficient to establish the existence of" a policy or custom for purposes of a *Monell* claim (citing *Mitchell v. City of New York*, 841 F.3d 72, 80 (2d Cir. 2016))); *Sarus v. Rotundo*, 831 F.2d 397, 402 (2d Cir. 1987) (finding that there no *Monell* claim existed where "the only relevant evidence presented by appellees was the manner in which they themselves were" treated). Thus, Plaintiff has also failed to establish that any of the alleged violations of his substantive due process rights occurred as a result of a municipal custom or policy.

For these reasons, Defendants' motion for summary judgment with respect to

---

[15] Plaintiff has introduced evidence showing that in 2015, Warren County case workers approved a thirteen year-old child living with a family friend who subsequently abused the child. *See* Dkt. No. 51 at 22-26. In that case, DSS workers approved the arrangement after the maternal grandmother – who had primary custody of the child after the father lost custody based on allegations that were later determined to be untrue – advised case workers that she no longer wished to care for the child, and supported the child living with the abuser prior to the abuse incident. *Id.* at 22-26. The DSS officials did not know at the time that the child's paternal grandmother also had custodial rights. *Id.* While such evidence perhaps raises issues regarding the adequacy of the investigation into the abuser of the child, in this case, Plaintiff and his wife initially consented to Lacey Ferguson having primary physical custody of their children. In addition, Plaintiff's due process claims against Defendants Raymond and Hoerter is based on actions and inaction that may have had an impact on future custody proceedings. There is no evidence that the Family Court in the aforementioned 2015 case approved of either the maternal grandmother or the child's abuser having custody of the child based on false or materially misleading statements made by a case worker to substantiate abuse allegations.

Plaintiff's Fourteenth Amendment municipal liability claim against Warren County is granted, Plaintiff's competing motion for summary judgment with respect to this claim is denied, and the claim is dismissed.

### C.    Fourth Amendment Unlawful Entry Claim

Defendants contend they are entitled to summary judgment with respect to Plaintiff's unlawful entry claim against Defendants Raymond because (1) Defendant Raymond has denied ever entering Plaintiff's residence without consent, and Plaintiff has failed to specify when the purported entry occurred, which allows the Court to conclude that it did not happen, (2) even if the entry occurred, it did not amount to an unlawful search based on "Supreme Court precedent", and (3) at a minimum, Defendant Raymond is entitled to qualified immunity. *See* Dkt. No. 157-2 at 17-19.

With respect to Defendants' first argument, Plaintiff has introduced sufficient evidence from which a rational factfinder could conclude that Defendant Raymond entered his residence on a date in August, 2018, without permission. Specifically, Plaintiff's wife testified that on a date in August, 2018, she greeted Defendant Raymond at the door of Plaintiff's (and her) residence, agreed to allow Defendant Raymond to see I.L. and S.L., and then pushed the door closed, though not latched, to retrieve the children, after which Defendant Raymond opened the door and took a few steps into the home. Dkt. No. 139-5 at 64-70; *see also* Dkt. No. 139-4 at 184-202; Dkt. No. 131-2, ¶ 46. Thus, for purposes of resolving Defendants' Motion for Summary Judgment with respect to Plaintiff's Fourth Amendment claim, the Court must assume that Defendant Raymond did in fact enter Plaintiff's residence on a date in August, 2018, without permission from Plaintiff or his wife. The issue then

becomes whether or not a reasonable factfinder could conclude that the purported entry violated Plaintiff's Fourth Amendment rights.

The Fourth Amendment protects "the people" from "unreasonable searches and seizures," and also provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing . . . the persons or things to be seized." U.S. Const. amend. IV. The Fourth Amendment governs entries and searches of homes made by social workers. *See Andrews v. Hickman Cnty*., 700 F.3d 845, 859 (6th Cir. 2012) ("[A] social worker, like other state officers, is governed by the Fourth Amendment's warrant requirement."); *Gates v. Texas Dep't of Protective & Regulatory Servs*., 537 F.3d 404, 420-24 (5th Cir. 2008) (holding Fourth Amendment governs social worker entry into home to investigate possible child abuse and considering and rejecting special needs exception in the same context); *Roska v. Peterson*, 328 F.3d 1230, 1242, 1249-50 (10th Cir. 2003) (holding that Fourth Amendment governs social worker warrantless entry and search of a home to investigate child welfare concerns but noting that lesser Fourth Amendment standard might apply to social workers in other contexts, and possible application of special needs exception for warrantless inspections of the safety of a child's conditions when the child is already in the children's services system); *Wildauer v. Frederick Cnty*., 993 F.2d 369, 372 (4th Cir. 1993) (engaging in Fourth Amendment reasonableness analysis, but noting that lesser scrutiny applies to non-criminal "investigative home visits" by social workers); *see also Young v. Suffolk Cty*., 922 F. Supp. 2d 368, 391 (E.D.N.Y. 2013) (recognizing that "social workers . . . have explicitly been found to be subject to the Fourth Amendment's warrant requirement" (citing *Andrews*, 700 F.3d at 859)); *cf. Palmieri v. Lynch*, 392 F.3d 73, 78-79

(2d Cir. 2004) ("A warrantless inspection of a private dwelling by a municipal administrative officer without the consent of the owner is generally unreasonable absent specifically delineated circumstances." (citing *Camara v. Mun. Ct. of S.F.*, 387 U.S. 523, 528-29, 539-40 (1967) (reversing an individual's conviction for refusing to allow a warrantless inspection of his residence by municipal building inspectors because the inspection was a significant intrusion and lacked "compelling urgency")).  "This . . . mean[s] that social workers . . . have to obtain consent, have sufficient grounds to believe that exigent circumstances exist, or qualify under another recognized exception to the warrant requirement before engaging in warrantless entries and searches of homes."  *Andrews*, 700 F.3d at 859-60.

Relying on *Wyman v. James*, 400 U.S. 309 (1971), Defendants argue that Defendant Raymond's actions, even as described by Plaintiff, did not constitute a "search."  Dkt. No. 157-2 at 17-18.  In *Wyman*, the Supreme Court held that home visits by a social worker to verify the resident's eligibility for benefits under New York's welfare program, which conditioned aid on a home visit and prohibited forcible entry, were not searches.  400 U.S. at 317-318.  The Court has little trouble concluding that the visit in *Wyman*, which was not forced or compelled, and could be refused by the aid applicant, is factually distinguishable from this case.  Here, the purported search of Plaintiff's residence was not in any way related the receipt of public funds or public assistance, and Plaintiff has introduced evidence showing that his wife attempted to prevent Defendant Raymond from gaining access to the interior of their residence immediately prior to the alleged entry.  Accordingly, for purposes of this Decision, the Court assumes that Defendant Raymond's actions constituted a "search" of Plaintiff's residence.

Notwithstanding this assumption, the Second Circuit has held that a non-law enforcement government officer such as Defendant Raymond may be excused from the warrant requirement if "forcing [that official] to follow ordinary law-enforcement requirements under the Fourth Amendment would impose intolerable burdens on the officer or the courts, would prevent the officer from taking necessary action, or tend to render such action ineffective[.]" *Tenenbaum v. Williams*, 193 F.3d 581, 603 (2d Cir. 1999). In that scenario, "the government officer may be relieved of [the warrant and probable-cause requirements] and subjected to less stringent reasonableness requirements instead." *Id.*; *see also Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) ("A search unsupported by probable cause can be constitutional . . . when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." (internal quotation marks omitted)).

Some courts have evaluated "reasonableness" under a "special needs" warrant exception, which requires "weigh[ing] the governmental conduct–in light of the purported special need and against the privacy interest advanced–by analyzing three principal factors: (1) the nature of the privacy interest allegedly compromised by the challenged governmental conduct, . . . ; (2) the character of the intrusion imposed by the challenged conduct . . . ; and (3) the nature and immediacy of the state's concerns and the efficacy of the governmental conduct in meeting them . . . ." *Palmieri*, 392 F.3d at 81 (quotations marks and citations omitted). Other courts have also evaluated "reasonableness" with respect to searches performed by non-law enforcement officials under the standard articulated in *Wyman*. *See Whalen v. McMullen*, 907 F.3d 1139, 1151 (9th Cir. 2018); *Wyman*, 400 U.S. at 318-324

(articulating the factors taken into account in determining the reasonableness of an administrative search).

Regardless of the appropriate standard for evaluating reasonableness in this case, questions of fact remain regarding why Defendant Raymond was at Plaintiff's residence in August, 2018, or felt compelled to force her way inside, as Plaintiff and his wife contend. For example, Defendant Raymond states in her affidavit that "[t]he purpose of any home visit [she] would have made to the LeClair residence in August 2018 would have been to assess the welfare of the LeClair children after multiple reports of child abuse/neglect of the LeClair children were made against a third-party." Dkt. No. 157-6, ¶ 35. However, the evidence in the record shows that Plaintiff and his wife were the source of the abuse reports, and the last such report appears to have occurred on July 9, 2018. Dkt. No. 131-2, ¶¶ 33, 43; Dkt. No. 157-3, ¶¶ 2-5; Dkt. No. 127-2, at 4, 74-75.

In addition, Plaintiff has presented evidence showing that prior to August, 2018, (1) he and his wife, as a matter of routine, brought their children outside when Defendant Raymond showed up at their residence to assess the children's welfare, and (2) Plaintiff's wife advised Defendant Raymond that she was not welcome inside their residence when Plaintiff was not home. Dkt. No. 139-5 at 67-71. Moreover, it is undisputed that on the date of the alleged unlawful entry, there was no ongoing CPS investigation against Plaintiff. *Compare* Dkt. No. 157-7, ¶ 97 *with* Dkt. No. 143, ¶ 97.

In short, accepting Plaintiff's version of the facts as true at this stage of the proceeding, a reasonable factfinder could conclude that (1) Defendant Raymond entered his residence without permission on one occasion in August, 2018, (2) Defendant Raymond was aware that she was not welcome to enter the residence to examine Plaintiff's children, and

would instead be able to examine them outside, (3) no exigent circumstances existed on the day of the alleged unlawful entry, and (4) there were no special needs that excused the warrantless entry. Thus, questions of fact remain regarding whether or not Defendant Raymond violated Plaintiff's Fourth Amendment rights in August, 2018.

Furthermore, although Defendants assert that Defendant Raymond should "at a minimum . . . be afforded qualified immunity" with respect to this claim, *see* Dkt. No. 157-2 at 18, the evidence in the record is not sufficiently developed to support this conclusion.

Qualified immunity shields government employees from liability under Section 1983 in two circumstances: "(1) [when] their conduct did not violate clearly established rights of which a reasonable person would have known, or (2) [when] it was objectively reasonable to believe that their acts did not violate these clearly established rights." *Cornejo*, 592 F.3d at 128 (internal quotation marks and alterations omitted). "'Clearly established' means that, at the time of the [official]'s conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)).

"Warrantless searches of a home are presumptively unreasonable." *United States v. Simmons*, 661 F.3d 151, 156 (2d Cir. 2011). Neither the Supreme Court nor the Second Circuit has expressly held that the Fourth Amendment prohibition on warrantless searches of homes applies, without exception, to social workers seeking to perform child wellness evaluations in response to abuse reports. However, "all agencies of government are governed by the unreasonable searches and seizures provision of the Fourth Amendment, [even though] there are some agencies outside the realm of criminal law enforcement where

44

government officials have "special needs beyond the normal need for law enforcement [that] make the warrant and probable-cause requirement impracticable." *Tenenbaum v. Williams*, 193 F.3d 581, 603 (2d Cir. 1999). The Second Circuit has "applied an objective analytical framework when assessing qualified immunity based on special need." *Berg v. Kelly*, 897 F.3d 99, 111 (2d Cir. 2018). The issue in such cases is "whether, in light of clearly established law and the information [the defendant] possessed, the defendant[ ] could have reasonably believed [her] search of plaintiff's home to be lawful." *Id.* (quoting *Moore v. Vega*, 371 F.3d 110, 116 (2d Cir. 2004)).

Here, Defendant Raymond's own records show that she made unannounced visits to Plaintiff's residence on August 14, 16, and 17, even though, based on the record before this Court, there was no ongoing CPS investigation against Plaintiff or his wife, or reports of child abuse made within the previous four weeks. *See* Dkt. No. 139-9.[16] A reasonable factfinder could potentially conclude from the lack of an ongoing CPS investigation against Plaintiff or his wife, and the absence of any abuse reports made against them, that Defendant Raymond did not have a basis to make unannounced visits to their residence in August, 2018.[17] Thus, on this record, construing the facts in the light most favorable to the Plaintiff, the Court cannot find that Defendant Raymond could have reasonably believed that it was lawful for her to open the door and enter Plaintiff's residence after Plaintiff's wife allegedly pushed the

---

[16] Although Defendants' statement of material facts indicates that there was no ongoing CPS investigation against Plaintiff in August, 2018, *see* Dkt. No. 157-7, ¶ 97, confusingly, Defendants state in their Reply Brief that "there was an ongoing CPS investigation against the plaintiff himself" on the date Defendant Raymond allegedly entered Plaintiff's residence. *See* Dkt. No. 159 at 7. There is, however, no evidence in the record that supports this amended position.

[17] ███████████████████████████████████████████████████

door closed during an unannounced visit. This is not a case where caseworkers "of reasonable competence could disagree on the legality of" the conduct alleged by Plaintiff. *Tenenbaum*, 193 F.3d at 605.

Accordingly, Defendants' motion for summary judgment with respect to Plaintiff's Fourth Amendment claim against Defendant Raymond is denied.

## IV.    MAGISTRATE APPEALS

### A.    Relevant Legal Standard

Non-dispositive motions decided by a magistrate judge may only be modified or set aside by the district judge assigned to the case where "the magistrate judge's order [is] found to be clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a).

Motions to compel are non-dispositive. *See Boice v. M+W U.S., Inc*., 130 F. Supp. 3d 677, 685 (N.D.N.Y. 2015) (Suddaby, C.J.) (stating that a motion to compel discovery is non-dispositive in nature). "The Second Circuit has stated, albeit in dicta, that a motion to amend is a 'nondispositive' matter which can be determined by a magistrate judge, pursuant to Fed. R. Civ. P. 72(a), subject to review under the 'clearly erroneous' standard set out therein." *Coral Crystal, LLC v. Fed. Ins. Co.*, No. 17-CV-1007, 2021 WL 84308, at *1 n.1 (S.D.N.Y. Jan. 11, 2021) (citing *Fielding v. Tollaksen*, 510 F.3d 175, 178 (2d Cir. 2007)). "However, some courts in this Circuit have determined that 'a denial of leave to amend premised on 'futility' is akin to the grant of a motion to dismiss . . . and should therefore be deemed dispositive, requiring de novo review pursuant to Rule 72(b).'" *Cordaro v. Dep't of Def.*, No. 6:19-CV-6601, 2021 WL 363791, at *2 (W.D.N.Y. Feb. 3, 2021) (quoting *Coral Crystal, LLC*, 2021 WL 84308, at *1 n.1 (collecting cases)).

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Concrete Pipe and Products of Cal., Inc. v. Constr. Laborers Pension Trust for South. Cal*., 508 U.S. 602, 622 (1993) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). An order is contrary to law "when it fails to apply or misapplies relevant statutes, case law or rules of procedure." *Tompkins v. R.J. Reynolds Tobacco Co.*, 92 F. Supp. 2d 70, 74 (N.D.N.Y. 2000) (Scullin, J.) (citation and internal quotations omitted).

"This standard is highly deferential, as magistrate judges are afforded broad discretion in resolving discovery disputes and reversal is appropriate only if their discretion is abused." *Best Payphones, Inc. v. Dobrin*, 409 F. Supp. 3d 130, 134 (E.D.N.Y. 2018) (internal quotation marks and citation omitted).

### B.     August 2020 Order and Related Appeal

In July, 2020, Plaintiff filed a motion to compel wherein he sought more complete answers to certain of his interrogatory requests, and the production of certain documents, including (1) documents related to third party investigations involving Plaintiff's children, (2) documents related to each of Defendant Raymond's unannounced visits to Plaintiff's residence in June, July, August, September, and October, 2018, and (3) photographs of Plaintiff's children. Dkt. No. 65 ("Motion to Compel"). Shortly thereafter, Plaintiff filed a motion for leave to serve additional interrogatories. Dkt. No. 66 ("Motion to Serve Additional Interrogatories"). Defendants opposed both motions. Dkt. Nos. 68, 69.

On August 26, 2020, Judge Stewart held a teleconference with Plaintiff and counsel

for the Defendants to address Plaintiff's pending motions and other outstanding discovery issues. After hearing from both parties on the record, Judge Stewart granted Plaintiff's Motion to Compel insofar as Plaintiff sought further responses to Interrogatory Nos. 3, 15, 16, 17, and 18. Dkt. No. 74 ("August 2020 Order"). Judge Stewart further required Defendants to submit to the Court for an in camera review, the Social Services records for visits to Plaintiff's residence for the 15 days before and after Defendant Raymond's alleged illegal entry in August, 2018. *Id*. Judge Stewart otherwise denied Plaintiff's Motion to Compel, including his request for documentary evidence related to investigations of his children that were determined to be unfounded based on a finding that such evidence was not "proportionately relevant to the claims that remain in the case." *Id*.

With respect to Plaintiff's Motion to Serve Additional Interrogatories, Judge Stewart directed Plaintiff to submit his proposed Interrogatories to the Court for review and consideration. *See* August 2020 Order.

Days after the aforementioned teleconference, Plaintiff filed an "Objection" to the August 2020 Order insofar as it denied his request for documents regarding (1) third party investigations involving his children that were determined to be unfounded, and (2) all of Defendant Raymond's unannounced visits through September, 2018. Dkt. No. 77. In his "Objection," Plaintiff argues that these documents are relevant to his remaining Section 1983 claims because they contain false statements and/or proof of a desire to interfere with, or negatively influence, his and his wife's custodial rights. *Id.*

Roughly one month later, Plaintiff filed a "Notice of Appeal" of the August 2020 Order. Dkt. No. 90. By Text Order entered on October 5, 2020, this Court found that Plaintiff's "Notice of Appeal" was duplicative of his "Objection," and set a deadline for Defendants to

respond to the appeal. Dkt. No. 94. Thereafter, Defendants opposed Plaintiff's appeal. Dkt. No. 96.[18]

Plaintiff has filed an appeal of the August 2020 Order insofar as it denied his request for documents regarding (1) third party investigations involving his children that were determined to be unfounded, and (2) all of Defendant Raymond's unannounced visits through September, 2018. Dkt. No. 77. Plaintiff argues that these documents are relevant to his remaining Section 1983 claims because they contain false statements and/or proof of a desire to interfere with, or negatively influence, the custodial rights of Plaintiff and his wife. *Id.* Defendants have opposed Plaintiff's appeal. Dkt. No. 96.

After carefully reviewing the papers herein, the Court finds that Magistrate Judge Stewart did not abuse his discretion when deciding Plaintiff's Motion to Compel. As a result, Magistrate Judge Stewart's rulings are accepted and adopted in their entirety for the reasons stated therein. The Court will add only that the documents that Plaintiff seeks to access through his appeal are in no way relevant to his Fourth Amendment claim against Defendant Raymond, which is the only claim that has survived summary judgment. Thus, even assuming that the documents Plaintiff sought in his Motion to Compel were relevant to his Fourteenth Amendment claims, the dismissal of those claims renders his appeal moot.

Accordingly, Plaintiff's appeal of the August 2020 Order is denied.

**C.      January 2021 Order and Related Appeal**

On December 16, 2020, Judge Stewart held a teleconference with Plaintiff and

---

[18] On October 9, 2020, Judge Stewart held another teleconference with Plaintiff and Defendants' counsel, and ruled, among other things, that Defendants provide Plaintiff with copies of the documents submitted for in camera review in accordance with the August 2020 Order. Dkt. No. 95.

Defendants' counsel to address the merits of various outstanding issues related to discovery disputes, discovery deadlines, alleged spoliation of evidence, and Plaintiff's proposed Third Amended Complaint. Dkt. No. 147, Transcript.[19]

On January 12, 2021, Judge Stewart issued a Memorandum-Decision and Order wherein he addressed the discovery portion of the filings at issue as follows: (1) Plaintiff's request to serve additional interrogatories (Dkt. No. 66) was denied as moot because Plaintiff failed to submit proposed interrogatories to the Court for review in accordance with the August 2020 Order, and discovery closed on November 30, 2020; (2) Defendants' request to strike certain additional discovery demands served by Plaintiff on December 4, 2020 (Dkt. No. 117) was granted; (3) Defendants' request to compel Plaintiff to respond to certain supplemental document demands served on October 30, 2020 (Dkt. No. 117) was granted, and Plaintiff was directed to respond to the demands within fourteen days; and (4) Plaintiff's requests for a further extension of discovery, issuance of subpoenas to conduct further fact gathering, and an order requiring Defendants to comply with Freedom of Information Law ("FOIL") requirements (Dkt. Nos. 115, 119, 129, and 134) were denied. Dkt. No. 148 ("January 2021 Order") at 3-5.

With respect to Plaintiff's request for sanctions based on counsel's purported production of falsified or altered documents, as well as the abject failure to produce certain documents (Dkt. Nos. 102, 107, and 111), Judge Stewart ruled that Plaintiff failed to establish that (1) Defendants' failure to preserve photographs of Plaintiff's children, which were not produced and no longer available, was in anyway intentional, vexatious, or done in

---

[19] The filings at issue were Dkt. Nos. 66, 81, 97, 98, 100, 102, 103, 107, 108, 117, 129, and 134.

bad faith, (2) the documents of home visit records produced by Defendants were falsified, and (3) the Social Services records produced by Defendants were sanctionable based on allegedly containing false information. *See* January 2021 Order at 5-15.[20] As a result, Judge Stewart denied Plaintiff's request for sanctions. *Id*. at 15.

Judge Stewart also denied Plaintiff's request for leave to file a Third Amended Complaint, which would have added his two children as additional Plaintiffs, and added ten new Defendants and several additional claims to this action, including some claims that were already considered and dismissed. *See* January 2021 Order at 16-21.

Lastly, Judge Stewart granted Plaintiff's requests to seal certain documents (Dkt. Nos. 81, 100, 103, and 112), which were submitted by him in connection with various pending motions. January 2021 Order at 22-23.

Days later, Plaintiff filed an Interlocutory Appeal of the January 2021 Order. Dkt. No. 154. On February 10, 2021, Plaintiff then filed a Notice of Appeal to the District Court of the January 2021 Order, apparently based on communication from the United States Court of Appeals for the Second Circuit advising that his appeal of the January 2021 Order must first be raised with the District Court. Dkt. No. 162. On March 10, 2021, Defendants filed a response in opposition to Plaintiff's appeal of the January 2021 Order. Dkt. No. 168. Thereafter, Plaintiff filed a letter brief in support of his appeal of the portion of the January 2021 Order that denied him leave to file a Third Amended Complaint, Dkt. No. 169, which this Court accepted for filing. Dkt. No. 170.

---

[20] Judge Stewart also expressed doubt as to whether the photographs of Plaintiff's children, taken as part of a third party investigation, as well as the home visit records, were relevant to the pending lawsuit, and declined to appoint a computer expert to review the "Connections system" containing the Social Services records. Dkt. No. 148 at 7-11.

Plaintiff states in his letter brief that he did not initially submit a memorandum with his prior appeal notices because he "was under the impression he would be preparing a brief for the 2nd Circuit." Dkt. No. 169. Plaintiff's letter brief then proceeds to raise arguments only as to why Judge Stewart erred in denying leave for Plaintiff to file a Third Amended Complaint. *Id.*

As an initial matter, because Plaintiff's letter brief addresses only Judge Stewart's denial of the motion for leave to file a Third Amended Complaint, Plaintiff's appeal is denied insofar as it seeks to challenge any other aspect of the January 2021 Order. *See, e.g., LoSacco v. City of Middletown*, 71 F.3d 88, 92-93 (2d Cir. 1995) (holding that issues not raised by pro se litigant in an appellate brief were abandoned, and explaining that, although "appellate courts generally do not hold pro se litigants rigidly to the formal briefing standards . . . [courts] need not manufacture claims of error for an appellant proceeding pro se, especially when he has raised an issue below and elected not to pursue it on appeal").

Furthermore, insofar as Plaintiff's appeal relates to the portion of the January 2021 Order that denied his motion for leave to file a Third Amended Complaint, the Court finds, after carefully reviewing the relevant submissions, no error, under either a de novo review or abuse of discretion standard. None of the claims in the proposed Third Amended Complaint bear any relationship to Plaintiff's Fourth Amendment claim against Defendant Raymond, which is now the sole remaining claim in this action. In addition, this Court previously considered and rejected several of the claims set forth in the proposed Third Amended Complaint, which are based on events long known to Plaintiff. For example, the proposed Third Amended Complaint once again contains claims against Jessica Vinson, the court-appointed attorney for Plaintiff's children, as well as Jeffrey Matte, who served as

private legal counsel for Plaintiff's wife in the Warren County Family Court proceedings. Neither individual is a state actor amenable to suit under Section 1983.

For all of these reasons, Plaintiff's appeal of the January 2021 Order is denied.

## V.     SEALING MOTIONS

On June 3, 2020, during the discovery phase of this case, the parties entered a Protective Order, which was endorsed by Magistrate Judge Stewart. Dkt. No. 60 ("Protective Order"). The Protective Order allows either party to designate information contained in a document, or provided during deposition testimony, as long as the designating party believes in good faith, upon reasonable inquiry, that the information qualifies as such. *Id*. at 1-2. The Protective Order further provides that information designated as "Confidential" may nonetheless be publicly filed if ordered by the Court, or if a request to seal the document is denied. *Id*. at 3-4.

Plaintiff seeks to seal each of the exhibits to his Motion for Partial Summary Judgment, *see* Dkt. Nos. 135, 136, 145, 149, as well as the records associated with his and his wife's arrest in New Hampshire, which he claims include certain personal identifiers, *see* Dkt. No. 142. Defendants oppose Plaintiff's request to seal the records associated with his and his wife's arrest in New Hampshire. Dkt. No. 157.

Defendants seek to seal certain exhibits to their motion – specifically, Exhibits C, D, G, H, I, J, and K – as well as unredacted versions of their statement of material facts and Exhibits B and L. Dkt. No. 157. Plaintiff does not oppose Defendants revised sealing

request.[21]

## A.    Relevant Legal Standard

Both the common law and the First Amendment protect the right of public access to

judicial documents.  *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 121 (2d Cir. 2006)

("[A] strong presumption of access attaches [to judicial documents], under both the common

law and the First Amendment.");  *see also Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982)

(explaining that judicial documents "should not remain under seal absent the most

compelling reasons").  "The notion that the public should have access to the proceedings

and documents of courts is integral to our system of government."  *United States v. Erie Cty.,*

*N.Y.*, 763 F.3d 235, 238-39 (2d Cir. 2014).  "Indeed, the common law right of public access

to judicial documents is said to predate even the Constitution itself."  *Id*. at 239.  The

"Constitution, and specifically the First Amendment to the Constitution, also protects the

public's right to have access to judicial documents."  *Id*.

Under the common law analysis, once the court finds "that the documents are judicial

documents and that therefore a common law presumption of access attaches," it "must

determine the weight of that presumption":

> The weight to be given the presumption of access must be governed
> by the role of the material at issue in the exercise of Article III judicial
> power and the resultant value of such information to those monitoring
> the federal courts. Generally, the information will fall somewhere on a
> continuum from matters that directly affect an adjudication to matters

---

[21] As noted, Defendants moved to seal the aforementioned documents, as well as affidavits and the memorandum of law in support of their Motion for Summary Judgment under seal.  *See* Dkt. No. 140.  After the Court denied this request without prejudice to Defendants filing a revised motion to seal with a more limited sealing request, Plaintiff opposed Defendants' request to seal affidavits and memoranda of law related to the summary judgment motions.  Dkt. No. 156.  Defendants then publicly filed the aforementioned affidavits and memorandum of law, as well as redacted versions of their statement of material facts and certain exhibits.  *See* Dkt. No. 157.

that come within a court's purview solely to insure their irrelevance.

*Lugosch*, 435 F.3d at 119 (quoting *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995)).  Next, the court must balance any "countervailing factors" weighing against the presumption of access.  *Id*. at 120.  "[T]he crux of the weight-of-the-presumption analysis" requires "balancing the value of public disclosure and countervailing factors such as (i) the danger of impairing law enforcement or judicial efficiency and (ii) the privacy interests of those resisting disclosure."  *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 143 (2d Cir. 2016) (internal quotation marks omitted).  "[T]he privacy interests of third parties [also] carry great weight in the balancing of interests."  *Dorsett v. Cty. of Nassau*, 762 F. Supp. 2d 500, 521 (E.D.N.Y.), *aff'd*, 800 F. Supp. 2d 453 (E.D.N.Y. 2011), *aff'd sub nom. Newsday LLC v. Cty. of Nassau*, 730 F.3d 156 (2d Cir. 2013).

The Second Circuit has described the "First Amendment framework" for sealing a judicial document as "more stringent."  *Lugosch*, 435 F.3d at 124.  Once the court concludes that there is a qualified First Amendment right of access to the judicial documents at issue, it may only seal the documents "if specific, on the record findings are made demonstrating the closure is essential to preserve higher values and is narrowly tailored to serve that interest."  *Id*. (quoting *In re New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987)).  Examples of "higher values" may include law enforcement interests, the privacy of innocent third parties, *Amodeo*, 71 F.3d at 1050, and trade secrets, *Ferguson v. Ferrante*, No. 13-CV-4468, 2015 WL 3404140, at *2 (S.D.N.Y. May 27, 2015).  The party seeking to maintain the judicial documents under seal bears the burden of showing that higher values overcome the presumption of public access.  *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 826 (2d

Cir. 1997).

**B.    Analysis**

Each of the documents that the parties seek to seal, "by virtue of having been submitted to the court as supporting material in connection with a motion for summary judgment[,] are unquestionably judicial documents under the common law." *Lugosch*, 435 F.3d at 123.  Further, the weight of the presumption of access "is of the highest: 'documents used by parties moving for, or opposing, summary judgment should not remain under seal absent the most compelling reasons.'" *Id*. (quoting *Joy*, 692 F.2d at 893).  Thus, there is both a common law presumption of access and a "qualified First Amendment right of access" to the exhibits at issue.  *Id*. at 123-24.  As a result, the Court must consider whether countervailing factors outweigh the presumption of access and whether sealing of this information is "essential" to serve a "higher value."  *Id*. at 120.

With respect to the records associated with Plaintiff and his wife's arrests in New Hampshire, according to Defendants' counsel, those documents are already a matter of public record, having been provided to counsel pursuant to a Freedom of Information Law request.  *See* Dkt. No. 157.  Accordingly, Plaintiff's motion to seal these documents is denied.  Furthermore, although Plaintiff contends that these documents contain certain personal identifiers, it appears that Defendants have properly redacted such information in their submissions.  *See* Dkt. Nos. 139-6 and 139-7.  Insofar as Plaintiff disagrees, he must advise the Court within twenty (20) days of the date of this Decision and Order, and specify, by docket and page number, where unredacted personal identifiers appear in the public record.  Unless and until Plaintiff makes such a submission, the arrest records as filed will

remain part of the public docket.

With respect to the remaining exhibits at issue, which the parties both agree should be sealed in certain respects and redacted in other respects, the Court finds, after careful consideration, that with the exception of Exhibit K to Defendants' Motion for Summary Judgment, and each of the Warren County Family Court Orders attached as exhibits to Plaintiff's deposition transcript, the privacy interests of third parties, and in particular I.L. and S.L., would be greatly jeopardized if the sealing and redaction requests were denied. The Court further finds that sealing information in these submissions is essential to preserving the aforementioned privacy interests, and in light of the manner in which private information is detailed in the documents that the parties seek to seal, redacting them is not practical. Thus, with the exception of Exhibit K to Defendants' Motion for Summary Judgment and each of the Warren County Family Court Orders attached as exhibits to Plaintiff's deposition transcript, sealing the documents that the parties seek to seal is "essential" to serve a "higher interest."

With respect to Exhibit K, which is a series of emails exchanged between Defendant Lord and a Warren County Family Court official, the Court finds that only the attachment to one of those emails, which is the Raymond Report, warrants remaining filed under seal. The substance of the email correspondence itself does not contain any discussions that jeopardize law enforcement interests, or the privacy of innocent third parties. Moreover, Plaintiff directly quoted the most substantive email in his Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment. *See* Dkt. No. 151 at 14-15. Thus, the Court finds that redacting these emails, and specifically the email addresses, phone numbers, and dates of birth contained therein, would be more appropriate than allowing the entire exhibit to remain under seal.

With respect to the Warren County Family Court Orders attached as exhibits to Plaintiff's deposition transcript, the Court finds that, with the exception of references to Plaintiff's children, the substance of these Orders does not jeopardize law enforcement interests, or the privacy of innocent third parties. In addition, the parties have discussed the substance of these Orders in various submissions. *See, e.g.*, Dkt. No. 157-7; Dkt. No. 143. Thus, the Court finds that filing these Orders, which are already redacted, would be more appropriate than allowing them to remain under seal.

In light of the foregoing, Plaintiff's motion to seal the exhibits associated with his Motion for Partial Summary Judgement is granted, and Defendants' motion to seal certain exhibits and redact other exhibits and documents is granted in part and denied in part. With respect to Exhibit K, Defendants must submit to the Court Clerk, within twenty (20) days of the date of this Decision and Order, a redacted version of this document for public filing, which will replace the current public record for this exhibit (Dkt. No. 139-12). With respect to the Warren County Family Court Orders attached as exhibits to Plaintiff's deposition transcript, Defendants must file these documents, in their redacted form, within twenty (20) days of the date of this Decision and Order.[22]

## VI.  CONCLUSION

**ACCORDINGLY**, it is hereby

**ORDERED** that Plaintiff's Motion for Partial Summary Judgment is **DENIED**; and it is further

**ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED in part and**

---

[22]  Consistent with the aforementioned rulings on sealing, the Court has redacted portions of this Decision for public filing. A non-redacted version of this Decision has been filed under seal.

**DENIED in part** as set forth above; and it is further

ORDERED that Plaintiff's appeal of Magistrate Judge Stewart's Order entered on August 26, 2020, is **DENIED**; and it is further

ORDERED that Plaintiff's appeal of Magistrate Judge Stewart's Order entered on January 12, 2021, is **DENIED**; and it is further

ORDERED that Plaintiff's sealing requests (Dkt. Nos. 135, 136, 142, 145, 149) are **GRANTED in part and DENIED in part** as set forth above; and it is further

ORDERED that Defendants' sealing request (Dkt. No. 157) is **GRANTED in part and DENIED in part** as set forth above; and it is further

ORDERED that Defendants must submit to the Court Clerk, within twenty (20) days of the date of this Decision and Order, a redacted version of Exhibit K to Defendants' Motion for Summary Judgment, which will replace the current public record for this exhibit (Dkt. No. 139-12); and it is further

ORDERED that Defendants must file, within twenty (20) days of the date of this Decision and Order, the Warren County Family Court Orders attached as exhibits to Plaintiff's deposition transcript, in their redacted form; and it is further

ORDERED that Plaintiff must advise the Court, within twenty (20) days of the date of this Decision and Order, of any documents publicly filed by Defendants that he believes contain personal identifiers, and identify such documents by docket and page number. Unless and until Plaintiff makes such a submission, the arrest records as filed (Dkt. Nos. 139-6 and 139-7) will remain part of the public docket; and it is further

ORDERED that the Court Clerk shall file, with appropriate restrictions, the sealed

documents in Defendants' Motion for Summary Judgment (Dkt. No. 139); and it is further

 **ORDERED** that Plaintiff's Fourth Amendment claim against Defendant Raymond will be scheduled for trial; and it is further

 **ORDERED** that the Clerk of the Court shall provide plaintiff with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam); and it is further

 **ORDERED** that the Clerk serve a copy of this Order upon the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

Dated: June 30, 2021

         Brenda K. Sannes
         U.S. District Judge